UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                        :        Chapter 7

LINDA AUGUST                                 :

             Debtor             :        Bankruptcy No. 09-19337
_____

ADAMAR OF NEW JERSEY, INC. t/a
TROPICANA CASINO AND RESORT                  :

            Plaintiff          :
      v.
                                             :
LINDA AUGUST
                                             :
                                                      Adversary No. 10-0013
            Defendant          :
_____

.................................................

OPINION

.................................................

In the above-captioned adversary proceeding, the plaintiff, Adamar of New Jersey, Inc. t/a Tropicana Casino and Resort ("Adamar"), seeks to have declared non-dischargeable, under 11 U.S.C. § 523(a)(2) and/or (a)(6), an unpaid $65,000 extension of credit to the debtor, Ms. Linda August. The debtor opposes such relief and has asserted a counterclaim under 11 U.S.C. § 523(d).

Evidence was offered over a multi-day period[1] and the parties have submitted post-trial memoranda. This proceeding is now ripe for determination.

_____

[1]The parties have obtained transcripts for two of the three days during which evidence was presented. References to those transcripts will be denoted "1 N.T. at" and "2 N.T. at." References to testimony offered on the other day will be made by citation to the audiodisk, with the time the testimony was offered.

I.

After consideration of the evidence presented and the parties' post-trial submissions, I find that the following material facts were proven.

1.  Adamar is a business corporation organized under the laws of a state other than Pennsylvania with its principal place of business at 2831 Boardwalk, Atlantic City, New Jersey.  At that location, Adamar operates a hotel and casino under the name Tropicana Casino and Resort.  Complaint and Answer, ¶ 1.

2.  The debtor, Linda August, is a self-employed consultant for events, such as fund raising and political campaigns.  1 N.T. at 129.  She holds college and graduate degrees in music and music education, respectively.  1 N.T. at 138.  Although sometimes referring to her consultancy business as Linda August & Associates, she has no employees and never established any business entity.  1 N.T. at 129-31.

3. In 2008, Ms. August reported gross income from her event planning business on her federal tax return of about $78,000, with a net profit of $37,060.  In addition, she reported $11,600 in wages.  Ex. P-8.  On her 2008 federal tax return, she reported "other income" of $2,361,849 and deducted gambling losses in the same amount. Id.

4.  In 2009, Ms. August reported on her federal tax return gross income of approximately $71,500 from her business, with net profits of $47,555, and wages of

2

$7,450.  Ex. P-9.  On her 2009 federal tax return, she reported "other income" of

$566,772, and gambling losses in the same amount.  Id.[2]

5.  Ms. August first established a line of credit with Adamar on December

1, 1981.  Joint Pretrial Statement, Uncontested Fact ## 3, 17; Complaint and Answer, ¶¶

6, 24.

6.  In order to obtain credit from Adamar, the gambling customer provides

information on an initial credit application.  That information includes the customer's

name, address, employment information, income earned and assets held, outstanding

indebtedness, and a list of any other casinos at which the patron has established credit.

The completed application is signed by the customer.  1 N.T. at 23-24.  Ms. August

signed such an application.  Ex. P-4.

7.  During the initial credit application process, Adamar conducts a

three-pronged investigation of the customer's credit-worthiness.  First, Adamar obtains a

consumer credit report.  Second, Adamar verifies the customer's bank account

information, including the existence of the account and its current and average balances.

Third, Adamar obtains a gaming report from a company called Central Credit, which

---

[2]By virtue of 26 U.S.C. § 165(d), an individual may deduct gambling losses "only
to the extent of gains from such transactions."  See generally In re Berardi, 70 Fed. Appx. 660,
662 (3d Cir. 2003) (non-precedential).  Thus, the debtor's gambling losses in 2008 and 2009
likely exceeded the amount disclosed on her federal tax returns as she took the maximum
deduction.

provides detailed information regarding the credit applicant's obligations to numerous casinos. 1 N.T. at 25-26, 28.[3]

8. Once credit is approved and a credit line established, Adamar obtains a new credit report for the customer every two years. 1 N.T. at 26.

9. Adamar is required to check the credit customer's bank records every two years, but has discretion to do so more frequently. 1 N.T. at 26. Before any modification is made to a customer's credit limit, Adamar verifies that it has a bank account verification on file from within the past two years and may, but generally does not, check the average and current bank account balances. 1 N.T. at 28-29.[4]

10. On an Adamar credit application dated December 17, 1988, Ms. August is listed as the owner of a manufacturing business called "Linda August & Associates." Her income is reported to be $50,000 per year, and she is identified as having $50,000 in other assets. She reports having no other outstanding indebtedness. Ex. P-4.[5]

11. The credit application, which bears Ms. August's signature, contains the following statement, which is consistent with N.J. Admin. Code 19:45-1.27(a)(8):

> I certify that I have reviewed all the information provided
> above, that it is true and accurate. I authorize Tropicana
> Hotel Casino to conduct such investigations pertaining to the

---

[3]Central Credit is a service based in Las Vegas that reports credit information about casino gamblers provided by its casino customers. See In re Miller, 310 B.R. 185, 189 (Bankr. C.D. Cal. 2004). New Jersey requires its licensed casinos to report to and obtain reports from a casino credit bureau. N.J. Admin. Code. 19:45-1.27.

[4]N.J. Admin. Code. 19:45-1.27(g)(4) states that when approving a credit limit increase a licensed New Jersey casino need only verify the customer's personal checking account information if such verification has not been undertaken within the previous 24 months.

[5]The document is entitled "Change of Address," however the parties refer to it as Ms. August's credit application.

4

above information as it deems necessary for the approval of
my credit limit.  I am aware that this application is required to
be prepared by the regulations of the Casino Control
Commission, and I may be subject to civil or criminal liability
if any material information provided by me is willingly false.

Id.

12.  During 2009 (and likely before that time) Ms. August traveled to
Atlantic City, New Jersey to gamble almost every weekend at one or more of its casinos,
including Adamar's Tropicana.  1 N.T. at 150.  She had established lines of credit at
many of those casinos, as well as casinos in Nevada, at least one as early as 1979.  Joint
Pretrial Statement, Uncontested Facts ## 4, 5; ex. D-2.

13.  Since 1981, Ms. August has lost and repaid to Adamar more than $1
million.  1 N.T. at 41; see Joint Pretrial Statement, Uncontested Facts ## 17-18.  Adamar
records reflect that she borrowed during this period $2,277,000 (and thus repaid all but
$65,000) and lost $1,380,000 in gambling at this casino.  Ex. P-3.

14.  Adamar provided Ms. August with a "player's card," referred to by
Adamar as a "Diamond" card.  1 N.T. at 38.  One purpose of the card is to allow the
casino to track the gambler's betting history, i.e., wins and losses.  Id.  For example, if the
gambler inserts the Diamond Card into a slot machine, Adamar will obtain a record of the
gambler's betting results.  Id.

15.  Based upon such tracking activity, Adamar may award to the Diamond
card customer gifts of food, beverages, entertainment, travel to other New Jersey casinos,
and hotel accommodations.  1 N.T. at 35-36; 2 N.T. at 49; see ex. P-3.

16.  Ms. August's preferred gambling activity is to bet on the slot machines.
Occasionally she gambled at blackjack.  Audiodisk 3:03.

5

17. Ms. August credibly testified that she did not always use her Diamond card when gambling at Adamar's casino. Sometimes she forgot to bring the card; sometimes she played two slot machines at the same time and used the card on only one machine. And sometimes she did not use the card for reasons of superstition. Audiodisk at 3:04-06.

18. Ms. August also received player's cards from other casinos. Those casinos used their cards as did Adamar: for tracking gambling wins and losses and in order to award gifts. She also did not always use her player's card when gambling at those other casinos. See 1 N.T. at 91 (referring to a notation from July 26, 2008 in Taj Mahal casino credit file, stating that Ms. August "does not always use the player card").

19. New Jersey law permits casinos to loan money to their customers. See N.J. Stat. Ann. 5:12-101.

20. In order to obtain such a loan, the customer must establish a line of credit with the casino, as Ms. August did with Adamar and other New Jersey casinos.

21. Upon application and approval, Adamar provides its customers with interest-free credit lines to finance their gambling activities. 1 N.T. at 40. The loans are without interest because Adamar expects, on average, that the customer will lose most if not all of the loan amount in gambling at its casino. 1 N.T. at 40.

22. Once a credit limit is established with Adamar, the customer may obtain cash or gambling chips from the casino at any time until the customer has borrowed her credit limit. 1 N.T. at 16, 20.

23. In order to obtain borrowed funds or chips with which to gamble, the customer must execute a counter check, known in casino parlance as "drawing a marker,"

6

in the amount to be loaned by the casino.  A marker, prepared by the casino, is encoded

with the customer's bank account information, so that the marker may be deposited into

Adamar's account and drawn from the customer's bank account.  1 N.T. at 11.[6]  The

customer may execute a marker in any amount up to the unused credit limit previously

established by the casino.

24.  Adamar uses a form marker for all markers executed at its casino.  That

form marker contains the following preprinted language: "I represent that I have received

cash for the above amount and that said amount is on deposit at said bank or trust

company in my name.  It is free from claims and is subject to this check." Joint Pretrial

Statement, Uncontested Fact # 8.

25.  When a marker is given to the casino by a customer, Adamar has the

authority from the customer to, but generally does not, communicate with the customer's

bank in order to verify the customer's account balance.  1 N.T. at 28.

26.  After the marker is executed and the customer obtains the loan amount

in cash or chips, Adamar retains the marker in its main cashier's cage until it is presented

to the customer's bank for payment.  The date on which the marker is presented for

payment varies depending upon the amount of the marker.  1 N.T. at 17.

27.  Prior to presentation at the customer's bank, the customer may redeem

or reduce the outstanding marker(s), or she may consolidate several outstanding markers.

---

[6]"As a term of art, marker is an instrument drawn in favor of the casino and in the
form of negotiable draft which, if not picked up by the player at the conclusion of play or shortly
thereafter, may be presented to the player's bank." Aaron, <u>Gambling Markers and Bankruptcy</u>,
2004 Norton Am. Surv. of Bankr. Law Part I, § D (Oct. 2004) (footnotes omitted).

To redeem a marker, the customer must present cash or chips to Adamar's cashier cage in an amount sufficient to eliminate the marker. 1 N.T. at 17.

28. Under New Jersey law, a casino may hold (i.e., not deposit) a marker in the amount of $1,000 or less for up to seven days. Markers between $1,000 and $5,000 may be held for up to 14 days. Markers over $5,000 may be held for up to 45 days. See N.J. Stat. Ann. 5:12-101(c); N.J. Admin. Code 19:45-1.28.

29. Adamar's policy, of which Ms. August was aware, see 1 N.T. at 145, is to hold markers over $5,000 for the maximum number of days allowed by law: 45 days. Adamar keeps track of the disposition time using a computer system that automatically calculates a deposit date for each marker issued. 1 N.T. at 18-19; exs. P-2a, b, c, d.

30. Adamar informally requests that its customers use funds borrowed from it in Adamar's casino only, and reduce outstanding markers with available funds before leaving the premises. 1 N.T. at 37-38. This request is not in writing. 1 N.T. at 42. Thus, a customer can obtain a loan from Adamar, but use some of the borrowed funds at another casino. 1 N.T. at 38-39, 49-50.

31. When receiving markers from a customer, Adamar typically will not confirm the amount of funds then on deposit in the customer's bank account. See 1 N.T. at 28-29.

32. Adamar receives frequent reports from Central Credit for each of its gambling customers that has an outstanding credit line. See ex. P-1. If that report reveals that the customer did not pay an outstanding marker when due, because the marker has been returned to another casino for insufficient funds, Adamar automatically suspends that customer's credit privileges at its casino. 1 N.T. at 22; see generally N.J. Admin.

8

Code 19:45-1.27(j).  However, after Adamar learns from Central Credit that the customer has repaid the delinquent marker, Adamar reestablishes its credit line for that customer.  1 N.T. at 33-34; <u>see</u> <u>generally</u> N.J. Admin. Code 19:45-1.27(j) ("Any patron having a check returned to any casino unpaid by the patron's bank shall have his credit privileges suspended at all New Jersey casino licensees until such time as the returned check has been paid in full or the reason for the derogatory[7] information has been satisfactorily explained.").

33.  Similarly, if an Adamar customer fails to repay an Adamar marker when presented for payment, Adamar immediately suspends the customer's credit line. <u>See</u> 1 N.T. at 70-72; 2 N.T. at 56; ex. P-1.

34.  When a customer requests an increase in her credit line, Adamar verifies that it has on file an average and current bank account balance from within the past two years, 1 N.T. at 28-29, obtains a current gaming report from Central Credit, 1 N.T. at 26, but does not necessarily communicate with the customer's bank to determine the amount of funds then on deposit.  1 N.T. at 28-29.

35.  When determining whether to increase a credit limit, Adamar places primary importance on its own experience with the customer and upon the Central Credit gaming report.  This report shows the customer's historic ability to repay her markers, which in gambling idiom is referred to as the customer's "play and pay history."  2 N.T. at 53:

---

[7]N.J. Admin. Code. 19:45-1.27 defines "derogatory" as information that the credit customer's "credit accounts [are] partially or completely uncollectible, checks [have been] returned unpaid by the patron's bank, settlements, liens, judgments and any other credit problems of the patron."

Q: . . . What is the biggest risk that you take with a new gambler?

A: With a new gambler you wouldn't have years of pay and play history.  So that would be one of the risks that you have an unknown entity who doesn't have this history that you can look at.  So this history of pay and play is something that gets a lot of weight when you're making a credit decision.

Q: And when they sign a check saying that they have cash in their account, what does the play and pay history give you there in regard to the ability to rely on that statement.

A: Well, the play and pay history gives you an example of the customer's creditworthiness and their ability to handle the credit.  When you have years to go back and look at a customer who has been able to handle different amounts of credit and always be able to pay it back it speaks directly to their creditworthiness and it weighs heavily on my decision-making to increase a credit line or make a credit adjustment.

(Testimony of Mr. Salvatore Perice, Adamar Executive Director of Casino Credit).

36.  If a customer requests an increase in her credit limit when that customer has outstanding but not delinquent markers owing to Adamar, Adamar typically requires the gambling customer to have lost a majority of the outstanding balance before it will increase the credit line.  For example, if a customer with a $25,000 credit line seeks to increase that line to $30,000, Adamar would verify from its Diamond card tracking records that the customer had lost a majority of the outstanding $25,000 before raising that customer's credit limit.  2 N.T. at 54.

37.  During her lengthy credit history with Adamar, Ms. August, on occasion, had Adamar markers returned for insufficient funds.  This resulted in her credit line being suspended.  Ex. P-1.  After she repaid those delinquent markers, her credit line was restored. 1 N.T. at 33-34; ex. P-1.

38.  Furthermore, Ms. August had markers returned to other casinos for insufficient funds.  Adamar was aware of this through its receipt of Central Credit gaming reports and acted accordingly to suspend her credit line.  1 N.T. at 33; ex. P-1.

39.  For example, Ms. August executed two markers totaling $12,500 to Adamar on December 26, 2008.  1 N.T. at 70.  These checks were presented for payment and were returned to Adamar for insufficient funds on February 17, 2009.  1 N.T. at 70; ex. P-1.  An Adamar employee informed Ms. August of this delinquency and of the suspension of her credit privileges until the markers were repaid.  1 N.T. at 71.

40.  On or about February 17, 2009, Ms. August reinstated her previously approved credit line in the amount of $60,000 by paying in full her returned markers.  Ex. P-1.  In so doing, Adamar noted in her credit file on February 20, 2009: "BK income & assets Play Reviewed not on ML 1:27A."[8]

41.  Ms. August, with her credit line restored, executed two markers in favor of Adamar on February 21, 2009 in the amounts of $15,000 and $26,000, respectively.  Complaint and Answer, ¶¶ 7, 10.  Ms. August knew those markers would be presented to her bank for deposit 45 days later: April 7, 2009.  Joint Pretrial Statement, Uncontested Fact # 9.

---

[8]N.J. Admin. Code 19:45-1.27(c)(5) requires licensed casinos in New Jersey to verify that the credit customer's "name is not designated on the master list of persons who have voluntarily requested suspension of credit privileges pursuant to N.J.A.C. 19:45-1.27A. . . ."  The reference in the credit report to "not on ML 1:27A" meant that Ms. August had not voluntarily suspended all credit lines with New Jersey casinos.

42.   The balance in Ms. August's Commerce/TD Bank checking account on February 21, 2009 was $2,038.73.  Ex. P-10; 1 N.T. at 142.[9]

43.   Ms. August executed another marker in favor of Adamar on February 27, 2009 for $19,000.  Complaint and Answer, ¶ 10; Ex. P-2d.

44.   The balance in Ms. August's checking account on February 27, 2009 was $975.14.  Ex. P-10.

45.   The marker executed on February 27, 2009 exhausted Ms. August's $60,000 credit limit with Adamar.

46.   On February 28, 2009, Ms. August sought and was granted a credit limit increase of $6,000.  Ex. P-1; 1 N.T. at 14.  Mr. Perice, the Executive Director of Casino Credit for Adamar's Tropicana Casino in Atlantic City, made the decision to increase Ms. August's credit limit.  1 N.T. at 46.

47.   In making that decision, Mr. Perice considered a credit report obtained on December 6, 2008, a Central Credit gaming report obtained on February 28, 2009, and a bank verification that was obtained within the past two years.  The bank verification contained the average balance over the life of the account, the then current balance, whether the account was a personal account, whether the customer could sign a loan, and the opening date of the account.  1 N.T. at 46-47.

---

[9]The debtor testified that, at this time, she had an inactive account with PNC Bank.  1 N.T. at 154 ("I had that bank account with PNC for a very long time, but it was always an inactive account.  I never kept any money in it.  Just didn't need to use two different accounts.").  The PNC account became active and the Commerce/TD Bank account was closed in April 2009.  1 N.T. at 148.  The markers at issue were all drawn on the debtor's active bank account with Commerce/TD Bank.

48.  Ms. August executed an additional marker in favor of Adamar on February 28, 2009 for $6,000.  Complaint and Answer, ¶ 11.

49.  The balance in Ms. August's checking account on February 28, 2009 was still $975.14.  Ex. P-10.

50.  New Jersey's Administrative Code directs that casinos record in their credit files "[a] brief summary of the key factors relied upon in approving or reducing the requested credit limit and any changes thereto[.]"  N.J. Admin. Code 19:45-1.27(f)(2).  As with the February 20, 2009 entry, the reason given on February 28, 2009 in approving the credit line increase was: "BK income & assets Play Reviewed not on ML 1:27A."[10]  Ex. P-1.

51.  Adamar's credit file discloses bank account verifications, without notation of the current balance in the account, done in February and December 2008, but none in February 2009.  Ex. P-1.

52.  In February 2006, Adamar had verified that the debtor's bank account held a current balance of "L-4" (probably meaning low four digits).  Ex. P-1.  The next actual verification of the current bank balance occurred on April 2, 2009.  Ex. P-1.

53.  Adamar also kept track of outstanding markers written by the debtor to itself and other casinos.  On February 26, 2009, Adamar verified that certain outstanding markers had been paid by the debtor to other casinos.  Ex. P-1.

---

[10]The reason given for this increase was initially noted in the credit file as "10% TTO Ratings Reviewed not on ML 1:27A."  The 10% likely refers to the percentage increase from $60,000 to $66,000.  "TTO" means this trip only.  See In re Video Depot, Ltd., 186 B.R. 126, 127 (Bankr. W.D. Wash. 1995).  Thus, this increased credit limit would not be permanent. This entry appears to be crossed out with the words "TTO not available" noted.  A new entry, quoted above, was written reflecting a permanent increase in Ms. August's credit line.

54.  Consistent with Adamar practice, Mr. Perice did not seek to determine the balance of Ms. August's bank account as of February 28, 2009 when he approved her increased credit limit.  1 N.T. at 47-48.

55.  Since Ms. August already had obtained $60,000 of credit when she sought an increase on February 28, 2009, Mr. Perice testified that: "I'd have to look at computer printouts, but I would say that if she owed [$]60,000 when I gave her the [$]66[,000] that she would have had to have lost a majority of the [$]60[,000] she already owed."  2 N.T. at 54.  In other words, Mr. Perice verified in some manner (possibly from Adamar's tracking records) that Ms. August had lost more than $30,000 of the $60,000 already borrowed.

56.  Ms. August's credit line was suspended by Adamar on March 10, 2009 because the Central Credit reports obtained by Adamar disclosed that she had markers that came due in March 2009 returned from her bank to other casinos.  Ex. P-1.

57.  However, Adamar records also reflect that by April 2, 2009 it was prepared to restore her credit line,[11] as approximately $120,000 in payments to other casinos were made by Ms. August.  See ex. P-1 (Central Credit Report April 2, 2009).[12]

58.  The four Adamar markers executed by Ms. August on February 21st,

---

[11]The notation in the credit file restoring the debtor's credit line on April 2, 2009 is crossed out.  It is unclear whether this notation change took place on April 2nd or occurred when her credit was suspended on April 7th.

[12]The handwritten Adamar credit limit report for April 2, 2009, and the handwritten notations on the Central Credit report of the same date appear to show that Adamar learned of payments of $32,000 to Caesar's Palace, $44,500 to the Taj Mahal Casino, and $71,400 to the Borgata Casino.

27th, and 28th, totaling $66,000, were sent for deposit after 45 days and all were returned to Adamar for insufficient funds.  Joint Pretrial Statement, Uncontested Fact # 19.

59.  As a result, Ms. August's credit line with Adamar was suspended on or about April 7, 2009.  Id., Uncontested Fact # 22.

60.  Ms. August's credit lines at other casinos that received the Central Credit gaming report were also suspended on or about April 7, 2009.  See 1 N.T. at 107-08 (Taj Mahal records reflecting credit suspension in April 2009).

61.  The actual markers executed on February 21, 2009 were returned to Adamar on April 14, 2009.  The marker executed on February 27 was returned on April 20, 2009.  The marker executed on February 28 was returned April 21, 2009.  Ex. P-1; 1 N.T. at 72.  As the credit line had been suspended days earlier, Adamar probably received a telephone message from an employee at the debtor's bank that the February 21st markers would not be honored.  See ex. P-1; 1 N.T. at 70-71.

62.  When each of the February 2009 markers was returned, Adamar's collections department sent Ms. August a letter and statement of account.  The letter informed her that her marker had been returned unpaid and that she should communicate with the casino.  Each letter and statement included the outstanding balance.  1 N.T. at 72-73; ex. P-5.

63.  Ms. August spoke with Ms. Lynn Mazzeo-Amoriello, the Director of Collections for Adamar, regarding the unpaid markers on or about April 28, 2009.

64.  Ms. August informed Ms. Mazzeo-Amoriello that she was having financial difficulties.  Ms. August testified that those difficulties stemmed from a loss of event-planning business and tax delinquency problems.  Ms. Mazzeo-Amoriello

explained that Adamar would need monthly payments on the debt commencing in May 2009.  1 N.T. at 73.

65.  Ms. Mazzeo-Amoriello testified that she has no record of an agreement having been reached with Ms. August regarding a monthly repayment plan.  1 N.T. at 79. There was no evidence in the debtor's credit file that such an agreement had been reached.

66.  Ms. August remitted checks for $500 each to Adamar on May 26, 2009 and June 26, 2009.  Joint Pretrial Statement, Uncontested Fact # 25.  Those two checks were cashed and reduced her outstanding obligation to $65,000.

67.  During the period between February 21, 2009, when Ms. August executed the first marker that gives rise to this proceeding, and April 7, 2009, when Ms. August's credit line was suspended, Ms. August executed markers at other casinos which were returned for insufficient funds after April 7, 2009.  These markers include:

| Casino | Dates Executed | Amount Outstanding |
| --- | --- | --- |
| Borgata Hotel and Casino | 3/9/09-4/4/09 | $137,000 |
| Trump Taj Mahal Hotel and Casino | 3/9/09-4/4/09 | $108,000 |
| Caesar's Casino, Las Vegas | 3/15/09-3/18/09 | $30,000 |

Joint Pretrial Statement, Uncontested Facts ## 13-15; 1 N.T. at 100 (stipulating that markers drawn from Taj Mahal were returned unpaid).

68.  The markers executed at the Borgata and the Taj Mahal casinos also contained preprinted language similar to that found on the markers executed at Adamar's casino.  Joint Pretrial Statement, Uncontested Fact # 16.

69.  According to Adamar's tracking records, between February 20, 2009 and February 28, 2009, Ms. August lost $24,119.40 at its casino.  Of this sum, $8,349.15

was lost on February 28, 2009.  Thus, Adamar believes that Ms. August "walked" or left

its casino on February 28, 2009 with $41,880.60 of borrowed funds unspent.  1 N.T. at

76-77.

70.  These records are inconsistent with the testimony of Mr. Perice that he

would have determined on February 28, 2009—when he granted Ms. August an increase

in her credit line to $66,000—that she had already lost more than half the $60,000 already

borrowed, or more than $30,000, before approving this increase.  2 N.T. at 54.

71.  Adamar's belief is also inconsistent with a notation made in Ms.

August's credit file that the she had been robbed of $10,000 prior to her seeking the

February 28th credit increase.  2 N.T. at 51; ex. P-1.

72.  It is stipulated that on March 15, 2009, Ms. August borrowed $30,000

from Caesar's casino in Las Vegas, that her markers were returned approximately 30 days

later for insufficient funds, and that, based upon tracking use of Ms. August's player's

card at that casino, she lost $11,992 of those borrowed funds.  1 N.T. at 116-119.

73.  The records of the Taj Mahal casino reflect that between March 9, 2009

and April 4, 2009, when Ms. August obtained $108,000 in credit, her player's card

tracking reflects losses of $69,800 at this casino.  1 N.T. at 101.

74.  Similarly, the records of the Borgata casino show borrowing of

$137,000 between March 9, 2009 and April 4, 2009, and losses of $75,000.  Audiodisk at

2:02-2:06.

75.  Adamar asserts, based upon those records, that Ms. August obtained or

"walked with" $191,188.60 in cash from its casino and the other three casinos between

February 21, 2009 and April 4, 2009.  This allegation was unproven.  Due to the inability

17

of casinos to track Ms. August's losses while gambling without using her player's cards, which Ms. August had a tendency to do, as well as their inability to determine whether Ms. August used the funds borrowed to gamble at other casinos in Atlantic City and Las Vegas, these tracking records provide incomplete proof of the disposition of these borrowed funds.

76. I further find that after April 4, 2009—as will be addressed below—Ms. August still had a strong propensity to gamble.[13]  She knew from prior credit suspensions that returned markers would terminate credit lines at all casinos that received a Central Credit report.  Adamar offers no plausible reason why Ms. August, after at least 30 years of consistent and heavy gambling using credit—she had gambled more than $2 million at Adamar alone—would limit herself to gambling solely on a cash basis.

77. Between February 21, 2009 and April 6, 2009, Adamar's records reflect that Ms. August repaid markers issued to other casinos in an amount in excess of $120,000.  Ex. P-1.

78. Adamar's tracking records (based upon use of the Diamond card) show that Ms. August continued to gamble at its casino on a cash basis after her credit was suspended on April 7, 2009.  On April 10, 2009, Ms. August lost $2,398.  She lost $6,008 on April 25, 2009 and $401 on a May 2, 2009.  She lost $99 on May 23, 2009 and, on a visit spanning May 31, 2009 until June 1, 2009, Ms. August lost $905.  She also lost $109 on June 6.  On July 3, 2009 Ms. August lost $503, and on August 1 she won $13.  Ex. P-3.

---

[13]Her attorney refers to this propensity as an addiction.  Debtor's Posttrial Memorandum, at 10.

79.  Taj Mahal's tracking records reveal that Ms. August continued to gamble on a cash basis after April 4, 2009.  That play was summarized at trial by Taj Mahal's collections manager as follows: "The 24th of April, '09, lost 20 bucks.  May 1st, '09, lost 1,670.  On 5/8/09, won 11,141.  On 5/16/09, lost $10,085.  On 5/22/09, lost $9,694.  On 5/29/09, won $395.  On 6/5/09, lost $4,491.  June 12th, '09, lost $2,732.  On June 19th, '09, lost $1,941.  On June 27th, won $260.  On July 3rd, lost $2,979.  On July 10th, '09, lost $3,419.  On 7/17/09, lost $4,715.  On the 24th of July, lost $2,736.  On July 31st, '09, lost $1,515.  On August 7th, '09, lost $1,210.  On August 14th, lost $1,933.  On August 21st, '09, lost $690.  On 8/27/09, lost $4,748.  On 9/4/09, lost $1,639.  On September 11th, '09, won $2,833.  On September 25th, '09, lost $7,786.  On October 2nd, lost $4,193.  On October 9th, '09, lost $1,662.  On September 23rd, '09, lost $1,898.  On October 30th, lost $912.  On November 6, '09, lost $1,436.  And on November 20th, lost $98."  1 N.T. at 107.

80.  To the extent that these tracking records are accurate, it appears that Ms. August continued to gamble after her credit was suspended; however, her inability to gamble on credit restricted the extent of her gambling, as the sums won or lost are far more modest then her 2009 results before April 7th.  See Joint Pretrial Statement, Statement of Uncontested Facts #23 ("There was little gambling by the Defendant after April 7, 2009."); ex. P-9 (reflecting gambling winnings and losses of more than $566,000 in 2009).

81.  The debtor made numerous deposits and withdrawals from her bank accounts first with Commerce/TD Bank and later with PNC Bank: between February 21, 2009 and April 6, 2009 (the day before her credit line was suspended); between April 7,

19

2009 and December 3, 2009 (the day of her bankruptcy filing); and between December 4, 2009 and September 15, 2010 (postpetition). Exs. P-10, P-11. Those deposits and withdrawals are summarized on Attachment A to this memorandum.

82. Approximately $8,900 of these deposits were derived from the sale by Ms. August of her personal property on eBay between May 2009 and June 2010. Audiodisk 3:20-3:21; ex. P-11.[14]

83. These deposits and withdrawals do not support Adamar's contention that "[s]he had significant amounts of cash [about $200,000] stashed away [after April 6, 2009] which she wanted to keep without having to pay back her casino debts." Plaintiff's Posttrial Memorandum, at 24. Instead, they reflect that after April 6, 2009, the debtor was in financial difficulties, had virtually no cash on the date she filed her bankruptcy petition, and continued to gamble, but for far lesser stakes than before, after her credit lines were suspended.

84. Ms. August filed a voluntary petition in bankruptcy under chapter 7 on December 3, 2009.

85. Her Bankruptcy Schedules I and J reflect monthly income and expenses of approximately $5,770. Bankruptcy Schedule B reveals that the debtor has only one outstanding bank account, containing $575.[15]

---

[14]This exhibit reflects PayPal as a source of some deposits.

[15]It was agreed by the parties that I should take judicial notice of these schedules, and should treat the information as accurate.

20

II.

I reach the following legal conclusions in this proceeding.

1.  Adamar holds a valid enforceable claim against the debtor in the amount of $65,000.

2.  Adamar had the burden to prove by a preponderance of the evidence that its claim is not dischargeable by virtue of section 523(a)(2)(A) and/or (B).

3.  Adamar did not meet its burden of proving actual reliance, a necessary element under section 523(a)(2).

4.  Adamar could raise a new claim during trial for relief under 11 U.S.C. § 523(a)(6), based upon the evidence presented at trial.  See Fed. R. Bankr. P. 7015 (incorporating Fed. R. Civ. P. 15(b)(1)).  Adamar's assertion of such a claim was grounded upon evidence adduced in support of its section 523(a)(2) claim, and so consideration of this additional claim does not prejudice the debtor.

5.  Adamar had the burden to prove by a preponderance of the evidence that its claim is not dischargeable by virtue of section 523(a)(6).

6.  Adamar did not meet its burden of proving that its $65,000 claim arose by willful and malicious conduct of the debtor.

7.  Adamar's claim under section 523(a)(2) was substantially justified.  As a result, the debtor is not entitled to relief under section 523(d).

III.

Adamar raises four related grounds in contending that its $65,000 claim against the debtor should be held nondischargeable.  It maintains that the debtor obtained money by false representation within the scope of section 523(a)(2)(A).  It also argues that the debtor obtained money by false pretenses, which is also prohibited by section 523(a)(2)(A).  In addition, Adamar contends that the debtor obtained money using a false financial statement within the meaning of section 523(a)(2)(B).  Finally, Adamar asserts that the debtor willfully and maliciously injured it, rendering the debt nondischargeable under section 523(a)(6).

The debtor responds that none of these claims for relief were proven.  She also argues that her distressed financial circumstances prevented her from repaying her February 2009 markers to Adamar, but that she fully intended to pay them at the time she signed them, as she had repaid many other markers to Adamar over the years.  She further denies any scheme to defraud Adamar and other casinos in February 2009 by borrowing money with the expectation of discharging her debts in bankruptcy.

A.

Before addressing these legal assertions and the debtor's opposition thereto, I must address a preliminary issue.

22

There is no dispute that the debtor in this adversary proceeding borrowed $66,000 from the plaintiff in February 2009 and only repaid $1,000 of that sum. There is also no dispute that the money was lent to the debtor by a New Jersey casino to enable her to gamble in that casino.

Section 523(a) provides that certain "debts" are not dischargeable. A debt is defined in section 101(12) as a "liability on a claim." A "creditor" is an entity that has a claim against the debtor. 11 U.S.C. § 101(10). And a claim means "a right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

> Accordingly, every dischargeability proceeding involves two separate inquiries. First, does the creditor hold an enforceable obligation under non-bankruptcy law. Second, is the debt non-dischargeable under bankruptcy law, specifically § 523(a). . . . In the absence of an enforceable obligation, there is no "debt" that can be non-dischargeable.

In re Roland, 294 B.R. 244, 249 (Bankr. S.D.N.Y. 2003) (citations omitted); see, e.g., In re McKendry, 40 F.3d 331, 337 (10th Cir. 1994); In re Bundick, 303 B.R. 90, 103 (Bankr. E.D. Va. 2003) ("An action to determine the dischargeability of a debt under § 523(a) has two components. . . . The first step requires that the creditor establish that a debt is in fact owed by the debtor.") (citations omitted); see, e.g., In re Hazelton, 304 B.R. 145, 150 (Bankr. M.D. Pa. 2003) ("Application of a subsection 523(a) discharge exception hinges on a finding, under applicable law, that the obligations at issue are personal debts of Debtor."); In re Desiderio, 213 B.R. 99, 106 (Bankr. E.D. Pa. 1997) ("[T]he presence of a debt in some amount must be proven to support a claim of nondischargeability."). If

Adamar does not hold a valid claim against the debtor then it cannot prevail under section 523(a)(2) or (a)(6).

Since 1794, Pennsylvania law has included a version of section 1 of the Statute of Queen Anne, enacted in 1710 in Great Britain, which, in effect, prohibits enforcement of gambling debts. 73 P.S. § 2031. New Jersey has a similar statute, N.J. Stat. Ann. 2A:40-3. New Jersey courts, however, have held that its Casino Control Act amended that earlier statute, and "that a loan made for casino gambling in Atlantic City[, New Jersey] is legal." Gottlob v. Lopez, 205 N.J. Super. 417, 420 (Sup. Ct. App. Div. 1985). Thus, under New Jersey law, Ms. August's debt to Adamar is enforceable. See Adamar of New Jersey, Inc. v. Scandrett, 2006 WL 3590057 (N.J. Sup. Ct. App. Div. 2006). But if Pennsylvania law is applicable this obligation may not be enforceable,[16] and Adamar's nondischargeability complaint would be denied. See In re Guevara, 409 B.R. 442 (Bankr. S.D. Tex. 2009) (dismissing a Louisiana casino's nondischargeability complaint against a Texas debtor for unpaid gambling markers, because Texas law renders such claims unenforceable).

Whether an entity holds an enforceable claim against the debtor is generally determined by relevant non-bankruptcy law, typically state law.

---

[16]In 2004, Pennsylvania enacted the "Pennsylvania Race Horse Development and Gaming Act," 4 Pa. C.S.A. §§ 1101 et seq. Prior to January 2010, section 1504 of that Act barred slot machine licensees in Pennsylvania from extending credit to gamblers. In January 2010, that restriction was lifted so long as the creditor also held a license for "table game operations." As the markers in this proceeding were issued in February 2009, it would appear that Pennsylvania courts would not enforce a claim for payment upon them if such claim were initiated in a Pennsylvania state court. Pennsylvania courts would, however, enforce a judgment issued by a New Jersey court against a Pennsylvania resident based upon a gambling obligation. Greate Bay Hotel & Casino, Inc. v. Saltzman, 415 Pa. Super. 408 (1992).

24

> This reading of § 502(b)(1) is consistent not only with the
> plain statutory text, but also with the settled principle that
> "[c]reditors' entitlements in bankruptcy arise in the first
> instance from the underlying substantive law creating the
> debtor's obligation, subject to any qualifying or contrary
> provisions of the Bankruptcy Code." Raleigh v. Illinois Dept.
> of Revenue, 530 U.S. 15, 20 . . . (2000).  That principle
> requires bankruptcy courts to consult state law in determining
> the validity of most claims.  See ibid.
>
> Indeed, we have long recognized that the "'basic federal rule'
> in bankruptcy is that state law governs the substance of
> claims, Congress having 'generally left the determination of
> property rights in the assets of a bankrupt's estate to state
> law.'" Ibid.

Travelers Casualty and Surety Co. of America v. Pacific Gas and Elec. Co., 549 U.S. 443,

450-51 (2007) (citations omitted); see, e.g., Vanston Bondholders Protective Committee

v. Green, 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting

obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question

which, in the absence of overruling federal law, is to be determined by reference to state

law.").

In determining which state law is relevant, I must consider federal common

law choice of law principles.  When bankruptcy litigation involves a dispute arising from

federal substantive law, such as 11 U.S.C. § 523(a), federal common law principles

typically will govern.  See generally Gluck v. Unisys Corp., 960 F.2d 1168, 1179 n.8 (3d

Cir. 1992) (holding that federal common law governs disputes involving ERISA); In re

Miller, 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003).  Thus, in decisions involving objections

to discharge and nondischargeability, courts have applied federal common law rather than

the forum state's choice of law approach to determine relevant state law.  See, e.g., Matter

of Crist, 632 F.2d 1226, 1229 (5th Cir. 1980), cert. denied, 451 U.S. 986 (1981); In re

Segretario, 258 B.R. 541, 544-45 (Bankr. D. Conn. 2001).  This is appropriate because the underlying adversary proceeding involves either the debtor's right to a bankruptcy discharge or the scope of that discharge, both of which involve important federal interests.  See generally Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934) (citations omitted):

> One of the primary purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." Williams v. U.S. Fidelity & Guaranty Co., 236 U.S. 549, 554, 555 . . . [1945].  This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

For example, in Vanston Bondholders Protective Committee v. Green, where the validity of a proof of claim in a bankruptcy case was at issue, the Court relied upon federal conflicts of law principles to determine the validity of the claim.  329 U.S. at 162.  See also In re Lindsay, 59 F.3d 942, 948 (9th Cir. 1995) ("In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."), cert. denied sub nom. Lindsay v. Beneficial Reinsurance Co., 516 U.S. 1074 (1996).

In general, "federal choice of law rules apply the law of the jurisdiction with the most significant relationship with the action."  In re Gaston & Snow, 243 F.3d 599, 605 (2d Cir. 2000), cert. denied sub nom. Erkins v. Bianco, 534 U.S. 1042 (2001); see also In re Olsen Industries, Inc., 2000 WL 376398, at *11 (D. Del. 2000).  New

Jersey, which is the location of the casino to which Ms. August repeatedly traveled, and is the location where she obtained her loans and executed the markers at issue in this proceeding, has the most significant relationship to this adversary proceeding. The issuance of such loans is heavily regulated by New Jersey. Therefore, I conclude that New Jersey law is applicable and Adamar holds an enforceable claim for $65,000 against this debtor. See In re Miller, 292 B.R. at 414 (and cases cited); see also In re Simpson, 319 B.R. 256, 265 (Bankr. M.D. Fla. 2003) (Nevada casino held a valid claim against a Florida resident who had left unpaid markers at the casino, despite Florida's restrictions on enforcement of gambling obligations). But see In re Guevara, 409 B.R. 442 (applying Texas state law for Texas debtor who left unpaid markers with Louisiana casino).

### B.

As noted above, Adamar seeks relief under section 523(a)(2). 11 U.S.C. § 523(a) states that "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt–

> (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained, by–
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

See generally Field v. Mans, 516 U.S. 59 (1995); In re Brady, 243 B.R. 253, 258 (E.D. Pa. 2000); In re Lee, 2000 WL 815928, at *2 (Bankr. E.D. Pa. 2000).

In parsing the language of section 523(a)(2)(A), courts have drawn a distinction between a "false representation" and "false pretenses":

> The "false representation" ground requires a showing that the debtor made a "false or misleading statement about something." [In re Barnaby, 2007 WL 750332,] at *2 [(Bankr. D.N.J. 2007)]. The second option, "false pretenses," requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the plaintiff. Id. at *2 (citation omitted). See [In re Ali, 321 B.R. 685,] at 690 [(Bankr. W.D. Pa. 2005)] (false pretense involves an implied misrepresentation, as distinguished from an express misrepresentation, that creates or fosters a false impression).

In re Giquinto, 388 B.R. 152, 165 n. 26 (Bankr. E.D. Pa. 2008); see, e.g., In re Brandon, 297 B.R. 308, 313 (Bankr. S.D. Ga. 2002); Matter of Haining, 119 B.R. 460, 463-64 (Bankr. D. Del. 1990); In re Weinstein, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983).

> As observed by another bankruptcy court:

> "False pretense do[es] not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for purposes of nondischargeability where circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor." Peterson v. Bozzano (In re Bozzano), 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994). . . . Failure to disclose material facts on which a transaction depends constitutes false pretenses within the statute.

In re Soliz, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996).

> For a plaintiff to prevail under the false representation provision of section

523(a)(2)(A) it must demonstrate that:

> (1) the debtor made the representations knowing they were false; (2) the debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representation having been made. See, e.g., Field v. Mans, 516 U.S. 59, 61 . . . (1995). . . .

In re Antonious, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citations omitted); see In re

Hilley, 124 Fed. Appx. 81, 82 (3d Cir. 2005) (non-precedential).

     The elements of establishing a nondischargeable claim for false pretenses

are similar:

> In order to establish that a debt is nondischargeable under §
> 523(a)(2)(A) as a debt for money, property, services, or credit
> obtained by false pretenses, a plaintiff must prove by a
> preponderance of the evidence that: "(1) the [defendant] made
> an omission or implied misrepresentation; (2) promoted
> knowingly and willingly by the defendant[ ]; (3) creating a
> contrived and misleading understanding of the transaction on
> the part of the plaintiff [ ]; (4) which wrongfully induced the
> plaintiff[ ] to advance money, property, or credit to the
> defendant."

In re Khafaga, 419 B.R. 539, 546 (Bankr. E.D.N.Y. 2009) (quoting In re Hambley, 329

B.R. 382, 396 (Bankr. E.D.N.Y. 2005)).

     Whether asserting that a false representation or false pretenses were made

and warrant relief under section 523(a)(2)(A), a showing of justifiable reliance and

causation of loss must be made.  See, e.g., In re Antonious, 358 B.R. at 182; In re Ali, 321

B.R. 685, 690 (Bankr. W.D. Pa. 2005).  Justifiable reliance is a lower standard than

reasonable reliance, but nonetheless requires that the creditor prove that it actually relied

upon the alleged misrepresention or false pretenses.  See Owens v. Owens, 155 Fed.

Appx. 42, 44-45 (2d Cir. 2005); In re Spigel, 260 F.3d 27, 32 (1st Cir. 2001):

> [i]n order to establish that a debt is nondischargeable because
> obtained by "false pretenses, a false representation, or actual
> fraud," we have held that a creditor must show that . . . 4) the
> creditor actually relied upon the misrepresentation, 5) the
> creditor's reliance was justifiable.

The creditor need not prove, however, that such actual reliance was reasonable, only justifiable.  As recently observed by the Seventh Circuit Court of Appeals:

> Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."  Field, 516 U.S. at 71, 116 S. Ct. 437 (internal quotation marks omitted). Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent.  Id. at 70-71, 116 S. Ct. 437.  But the justifiable reliance standard is not an objective one. Rather, it is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff.

Ojeda v. Goldberg, 599 F.3d 712, 717 (7th Cir. 2010).

Moreover, when seeking a determination under section 523(a)(2), the plaintiff/creditor bears the burden of proving all the elements of nondischargeability by a preponderance of the evidence.  See, e.g., In re Graham, 973 F.2d 1089, 1101 (3d Cir. 1992) (citing Grogan v. Garner, 498 U.S. 279, 288 (1991)).  Furthermore, when evaluating whether a debtor intended to deceive a creditor by her misrepresentations or false pretenses, a court must evaluate the debtor's intention, Field v. Mans, 516 U.S. at 59, at the time the misrepresentation, either express or implied, was made.  Matter of Jadusingh, 2001 WL 360701, at *2 (E.D. Pa. 2001).  Such intent may be proven by circumstantial evidence.  See, e.g., In re Giquinto, 388 B.R. at 166.

C.

30

Relief under section 523(a)(2)(B) requires that Adamar prove that its claim against Ms. August for money loaned and unpaid was based upon the debtor's use of a writing that is (i) materially false; (ii) respecting Ms. August's financial condition; (iii) on which Adamar reasonably relied; and (iv) that Ms. August caused to be made or published with intent to deceive.  See, e.g., In re Cohn, 54 F.3d 1108, 1114 (3d Cir. 1995).  In discussing materiality, the Third Circuit Court of Appeals referred favorably to a definition set forth in In re Bogstad, 779 F.2d 370, 375 (7th Cir.1985) (citations omitted):

> Material falsity has been defined as "an important or substantial untruth." . . .  A recurring guidepost used by courts has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition.

The Third Circuit further explained:

> The materiality prong of the "material falsehood" test includes a certain reliance component.  Under a materiality analysis, we refer to a creditor's reliance upon a false statement in the sense that an untruth can be considered important (or "material") if it influences a creditor's decision to extend credit.  However, a statement can still be material if it is so substantial that a reasonable person would have relied upon it, even if the creditor did not in fact rely upon it in the case at hand.

In re Cohn, 54 F.3d at 1114.

Insofar as reasonable reliance under section 523(a)(2)(B) is concerned, the Third Circuit has set forth this standard:

> The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances. . . .

> A determination of reasonable reliance requires consideration
> of three factors: (1) the creditor's standard practices in
> evaluating credit-worthiness (absent other factors, there is
> reasonable reliance where the creditor follows its normal
> business practices); (2) the standards or customs of the
> creditor's industry in evaluating credit-worthiness (what is
> considered a commercially reasonable investigation of the
> information supplied by debtor); and (3) the surrounding
> circumstances existing at the time of the debtor's application
> for credit (whether there existed a "red flag" that would have
> alerted an ordinarily prudent lender to the possibility that the
> information is inaccurate, whether there existed previous
> business dealings that gave rise to a relationship of trust, or
> whether even minimal investigation would have revealed the
> inaccuracy of the debtor's representations).

In re Cohn, 54 F.3d at 1117 (citations omitted).

In applying this standard, however, the Third Circuit instructed: "Section

523(a)(2)(B)(iii), however, requires that the creditor actually rely on the debtor's

statement.  Accordingly, if it were reasonable to rely on a debtor's statement, but the

creditor did not in fact rely upon the false statement, [section 523(a)(2)](B)(iii) would not

be satisfied."  Id., 54 F.3d at 1115 (emphasis in original).


IV.


In seeking a determination that its $65,000 claim against Ms. August is

nondischargeable under section 523(a)(2), Adamar initially relies upon preprinted

language found on all of the February 2009 unpaid markers signed by Ms. August: "I

represent that I have received cash for the above amount and that said amount is on

deposit at said bank or trust company in my name.  It is free from claims and is subject to

this check."  The evidence is undisputed that, at the time she signed those markers, Ms.

32

August did not have sufficient funds in her bank account to cover those markers.  It is also undisputed, however, that the debtor had previously provided Adamar with accurate information about her income and assets on her credit application.

Adamar contends that this signed statement on the four unpaid February 2009 markers is both a false representation under section 523(a)(2)(A) and a materially false written statement of the debtor's financial condition under section 523(a)(2)(B).  As to the latter, at least two reported decisions support Adamar's contention that such a statement on a gambling marker will constitute a written financial statement.  See In re Ridge, 2010 WL 3632818, at *4 (Bankr. E.D. Va. 2010); In re Poskanzer, 143 B.R. 991, 1000 (Bankr. D.N.J. 1992).  I shall further accept arguendo Adamar's implicit contention that the preprinted language on its markers was "material" within the meaning set forth by the Third Circuit in In re Cohn, 54 F.3d at 1114, quoted above.

Nonetheless, I agree with the debtor's position that Adamar failed to meet its burden of proving that it actually relied upon the preprinted language on those markers when extending credit to Ms. August in February 2009.  In other words, Adamar did not demonstrate that, when reinstating on February 20th and then increasing the debtor's credit line on February 28th, first to $60,000 and then to $66,000, it either justifiably relied or reasonably relied upon Ms. August's signed statements that on February 21st, February 27th, and February 28, 2009, she had funds in her bank account at least equal to the amount of her outstanding markers.[17]

---

[17]I thus do not reach the debtor's alternative position that she had no intention of misleading Adamar about the amount of funds available in her bank account when she signed those February 2009 markers.

First, Adamar's extensive credit file on this debtor, exhibit P-1, reveals that it first established a $60,000 credit limit for Ms. August some months before February 2009.  Ex. P-1.  The credit line was increased from $55,000 to $60,000 temporarily in August 2008 and made permanent in September 2008.  Id.[18]  There was no evidence that this increase was approved based upon the preprinted language on Adamar's markers.  Indeed, the remarks in August 2008 refer only to "ratings reviewed" and in September 2008 to "BK Income & Assets Play Reviewed not on ML 1:27A."

Only the $6,000 added credit limit was approved at the time of the unpaid markers.  Thus, the initial decision to extend Ms. August $60,000 in credit was not based upon any representations made by her in February 2009.  Furthermore, the February 2009 increase from $60,000 to $66,000, first a temporary increase which is crossed out and a permanent one approved, contains the very same remarks in her credit file as were made in 2008: "BK Income & Assets Play Reviewed not on ML 1:27A."

Moreover, once Adamar established a credit limit for a customer, that customer was authorized to sign markers up to the credit limit without further verification or investigation by Adamar.  Thus, in accepting a marker from Ms. August, Adamar was relying upon its earlier determination to approve her credit limit.

Second, Adamar acknowledged that in accepting Ms. August's markers in February 2009, it intended to present them for payment, if necessary, no earlier than April 2009.  No agreement or understanding was either sought or reached prohibiting the debtor from withdrawing funds in her bank account between February 2009 and April 2009.

---

[18]It was initially increased temporarily, "TTO," in August 2008 and then made permanent in September 2008.  Ex. P-1.

Thus, the status of Ms. August's bank account in February 2009 would not insure an ability to repay 45 days later.  Perhaps for that reason, Adamar never checked on her outstanding account balance when accepting her markers in February 2009.

Third, and most important, Adamar acknowledged that in accepting her four markers in February 2009, it was relying upon her "play and pay" history with it (and with other casinos as detailed in numerous Central Credit reports): a history that spanned almost thirty years.  Since 1981, Ms. August had repaid Adamar markers in excess of $2 million.  She was a valued gambling customer to this casino.  As Adamar's credit manager sensibly testified, the casino, in deciding whether to extend credit, is attempting to assess the customer's ability to repay the loan:

> [T]he play and pay history gives you an example of the customer's credit worthiness and how they're able to handle the credit.  When you have years to go back and look at a customer who's been able to handle different amounts of credit and always be able to pay it back, it speaks directly to their credit worthiness.

2 N.T. at 53.

As one court recently observed in considering the application of section 523(a)(2) to an unpaid gambling debt owed to a different New Jersey casino, but one using similar preprinted language on its markers:

> The complicating factor, not only with respect to materiality and intent to deceive, but most importantly, with respect to reasonableness of reliance, is that neither Boardwalk nor the debtor expected that the counter checks would necessarily be presented for payment.  Caesars, consistent with New Jersey law, see N.J. Stat. Ann. § 5:12-101c,  allowed the debtor 45 days in which to redeem the counterchecks by providing payment in some other form, which might very well come from some source other than the account on which the counter checks were drawn.  The counterchecks, in short, were not the expected mode of payment, but rather a back-up.  That being

35

> the case, the reality is that Boardwalk was relying less (if at
> all) on the account balance on a particular date—which in any
> event is no assurance that the funds would still be there 45
> days later—than on the customer's general financial condition
> and established record of payment.  Having considered all the
> evidence, the court cannot find that Boardwalk has met its
> burden of showing that it relied on the debtor's statement that
> he had funds in SunTrust on December 31, 2006, equal to the
> amount of the markers.  It appears, rather, that Boardwalk
> relied primarily if not exclusively on the debtor's credit
> history with other casinos and on his play-and-pay history at
> Caesars.

In re Ridge, 2010 WL 3632818, at *5 (footnote omitted); see also In re Simpson, 319

B.R. 256, 261 (Bankr. M.D. Fla. 2003) ("Plaintiffs' reliance instead was on Defendant's

Pay and Play history").

Accordingly, without persuasive evidence that it actually relied upon the

preprinted statement on its markers, Adamar has not demonstrated that such statement,

although untrue, warrants a finding of nondischargeability under section 523(a)(2)(A) or

(B).


V.


Adamar also vigorously contends that the debtor obtained her casino credit

under false pretenses within the meaning of section 523(a)(2).  It maintains that, when she

borrowed funds in February 2009, Ms. August had no intention of either gambling with or

repaying those funds.  It relies upon its tracking records, and those of other casinos, to

support its contention that the debtor intended to and did "walk" with almost $200,000

from Adamar and other casinos between February 28, 2009 and April 4, 2009.


36

When Ms. August received $66,000 in credit in late February 2009, she made an implied representation, independent from any preprinted language on her markers, of an intention to gamble with the funds and repay this debt.  See, e.g. In re Anastas, 94 F.3d 1280, 1285 (9th Cir. 1996).  If she did not have such an intention, I agree with Adamar that the debtor would have obtained this credit under false pretenses. See, e.g, id., 94 F.3d at 1285.

I find, however, Adamar's contention of false pretenses, for which it again had the burden of proof, also unproven.

First, Adamar's position relies heavily upon casino tracking data.  The accuracy of that data is undermined by the debtor's credible testimony, supported by the credit file at another casino, that she did not always use her player cards when gambling at casinos.  As the tracking data is dependent upon such player card use, the data is at best incomplete.

Second, the evidence is overwhelming that Ms. August in February 2009 was an habitual gambler, often relying upon credit to participate in this activity.  Every weekend saw her travel to one or more casinos in Atlantic City or Las Vegas.  The debtor also knew that her failure to honor her markers would suspend her credit lines at Adamar and all other casinos that subscribed to the Central Credit report.  Such suspensions had happened before.

The ability to obtain casino credit for gambling purposes has been viewed by at least one commentator as a strong marker repayment incentive to the habitual gambler:

> The marker has greater prospects for collection than non-
> gambling credit simply because the casino has the threat of

37

> cutting off the gambler if the marker is not paid.  The threat of
> being deprived action may be more formidable than any threat
> posed by legal process.  The threat may be most frightening to
> the pathological gambler.

Aaron, Gambling Markers and Bankruptcy, 2004 Norton Am. Surv. of Bankr. Law Part I,

§ D (Oct. 2004) (footnotes omitted).

Adamar offers no reason for Ms. August to suddenly decide in February

2009, after extensive and habitual gambling for decades, to limit future gambling

activities to those on a cash only basis.  There was no evidence that she decided to cease

gambling.  And there was clear evidence that she knew that unpaid markers would

suspend her credit at all casinos.

Third, there is no evidence of Ms. August either earning a six-figure income

during her many years as a habitual gambler, or of receiving gifts or bequests that would

finance her gambling activities.  Nevertheless, she was able to repay Adamar more than

$2 million in markers over many years.  Moreover, apparently Ms. August did win her

bets on occasion, as she disclosed more than $2 million in winnings in 2008 and $566,000

in winnings in 2009.  Given the parties' stipulation that her gambling decreased after her

credit lines were suspended on April 7, 2009, the bulk of her winnings in 2009 would

have occurred in the first three months of that year.

Fourth, the evidence revealed that on April 6, 2009, the debtor had but $405

in cash in her bank account.  See Attachment A.  Thus, Adamar implies that the debtor

was hiding almost $200,000 in cash at that time.  Its evidence though—deposit and

withdrawal records after April 6, 2009 from her two bank accounts—is at least equally

38

consistent, if not more so, with the source of such deposits being her gambling winnings at smaller stakes, as well as the sale of personal items on eBay and business income.[19]

Fifth, Ms. August honored markers that came due before April 6, 2009, including those in March 2009 owing to other casinos. She also made two $500 payments toward her credit line with Adamar in May and June 2009. Such conduct undermines Adamar's assertion that she schemed to defraud all casinos beginning in February 2009.

In sum, based upon her extensive gambling and credit history with Adamar, her repayment over the years of more than $2 million, her substantial if not consistent gambling winnings, as well as the debtor's credible testimony on this point, I find that Ms. August believed in February 2009 that she would be able to repay Adamar the $66,000 she borrowed, and intended to do so, presumably from her gambling winnings. Such a belief may have defied the odds, particularly when gambling on the slot machine; however, this belief does not support Adamar's conclusion that Ms. August never intended in February 2009 to repay it and obtained her loans under false pretenses. See In re Hall, 228 B.R. 483, 490 (Bankr. M.D. Ga. 1998) ("So long as the debtor has an honest, even if unreasonable, belief that he will get lucky at gambling and pay off his debts then this Court is satisfied that the debtor has the requisite intent to repay."); In re Scocozzo, 220 B.R. 850 (Bankr. M.D. Pa. 1998); In re Murphy, 190 B.R. 327, 334 (Bankr. N.D. Ill. 1995) ("In this case, considering all the circumstances, the Court finds that at the time the Debtor incurred the debts at issue he intended to repay them and believed (however

---

[19]For example, as an event planner, the debtor presumably received deposits from her clients. The evidence disclosed that she did not maintain separate bank accounts for business and gambling income.

unreasonably) that he would have the means to do so from his gambling and investments. The Debtor had for years successfully relied on such 'income' to pay off his credit card debt."); see also In re Pusateri 432 B.R. 181, 201 (Bankr. W.D.N.C. 2010) ("twelve year exemplary borrowing history" with the credit union was evidence of the debtor's intent to repay the debt).

      In so concluding that Adamar did not meet its evidentiary burden on this point, I find distinguishable the facts in In re Poskanzer, 143 B.R. 991 (Bankr. D.N.J. 1992), a decision relied upon by Adamar.  Not only was there no evidence presented of that debtor's "play and pay history" in that case, but the debtor in Poskanzer was found to have undertaken a substantial "gambling spree" while contemplating bankruptcy:

> The debtor, who is an experienced businessman, engaged in this casino gambling spree without revealing his true financial status to any of his other casino creditors.  They were notified only by [the] filing of a chapter 7 petition.  The record reflects that the debtor considered filing for bankruptcy more than one year prior [to] his actual filing.  Further, the debtor solicited a bankruptcy petition form approximately one month prior to his actual filing.  Such conduct may only be construed as nondischargeable when viewed in the context of the debtor's financial condition.

Id., 143 B.R. at 999; see In re Miller, 310 B.R. 185, 198 (Bankr. C.D. Cal. 2004) (distinguishing Poskanzer as involving a debtor that obtained "more than $875,000 in credit from various casinos less than 30 days before filing his bankruptcy petition.").

      In contrast, there is no credible evidence that the debtor here undertook a gambling spree in late February 2009, with the contemplation of bankruptcy.  Instead, the debtor testified that economic reversals in her business, including problems with taxing authorities (probably coupled with gambling losses) prevented her from honoring her markers.

Therefore, Adamar did not establish that it provided credit to the debtor based upon false pretenses.

## VI.

In addition, Adamar contends that it is entitled to relief under section 523(a)(6).  This claim was not raised in its complaint nor in the parties' final joint pretrial statement.  Thus, the debtor objected at trial to consideration of this newly raised claim.

## A.

Federal Rule of Bankruptcy Procedure 7015 incorporates Fed. R. Civ. P. 15 in adversary proceedings.  Rule 15(b)(1) states in relevant part:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

Therefore, if a defendant objects to evidence presented at trial for being outside the scope of the claims raised by the plaintiff in his pleadings, and if the defendant has not expressly or implicitly consented to a determination of the additional claim, a court may admit the evidence and treat the underlying complaint as amended to

41

encompass this additional claim if the presentation of the merits of the action will be

subserved and the opposing party is not thereby prejudiced.  See, e.g., Hardin v.

Manitowoc-Forsythe Corp., 691 F.2d 449, 457 (10th Cir. 1982);  Seybold v. Francis P.

Dean, Inc., 628 F.Supp. 912, 914 (W.D. Pa. 1986).  As the Third Circuit Court of Appeals

has instructed:

> The primary consideration in determining whether leave to
> amend under Fed. R. Civ. P. 15(b) should be granted is
> prejudice to the opposing party. . . . The principal test for
> prejudice in such situations is whether the opposing party was
> denied a fair opportunity to defend and to offer additional
> evidence on that different theory.

Evans Products Co. v. West American Ins. Co., 736 F.2d 920, 924 (3d Cir. 1984)

(citations omitted); see, e.g., Still v. Regulus Group LLC, 2004 WL 32378, at *1 (E.D.

Pa. 2004); see generally Lundy v. Hochberg, 79 Fed. Appx. 503, 506 (3d Cir. 2003).

Ms. August did not expressly or implicitly consent to the plaintiff's attempt

to assert a section 523(a)(6) claim at trial.  I may, nevertheless, admit the evidence and

treat the underlying complaint as amended if I find that doing so would be helpful to the

presentation of the merits of the case and would not prejudice Ms. August.

In this proceeding, Adamar's evidence in support of its claim under section

523(a)(6), as will be discussed below, is in essence a variant of its false pretense claim:

that Ms. August, in February 2009, intended to wrongfully borrow funds from casinos

without any intention of repayment.  See Plaintiff's Posttrial Memorandum, at 17.  As the

debtor was fully prepared to oppose this contention at trial, it would not be prejudicial to

consider this alternative theory.  See In re Gelhaar, 2010 WL 4780314, at *5 n.3 (Bankr.

N.D. Ill. 2010); In re Ruderson, 2007 WL 4570581, at *5 (Bankr. N.D. Ohio 2007); 3

Moore's Federal Practice 3d, § 15.18[2] (2010) ("[T]he opposing party is not prejudiced

by evidence that only presents a new legal theory, but is based on the facts and

circumstances constituting the claims already set out in the unamended pleadings.").

B.

Section 523(a)(6) of the Bankruptcy Code provides:

A discharge under section 727, 1141, 1228(a), 1228(b), or
1328(b) of this title does not discharge an individual debtor
from any debt— . . .

(6) for willful and malicious injury by the debtor to another
entity or the property of another entity.

To prevail, the plaintiff must establish the elements of section 523(a)(6) by

a preponderance of the evidence.  See, e.g., In re Keaty, 397 F.3d 264, 270 (5th Cir.

2005); In re Scarborough, 171 F.3d 638, 641 (8th Cir. 1999); see generally Grogan v.

Garner, 498 U.S. 279, 291 (1991).

Prior to the enactment of the 1978 Bankruptcy Code, bankruptcy courts

found that a nondischargeable injury arose whenever the debtor's conduct was at least

reckless and was done without just cause.  Tinker v. Colwell, 193 U.S. 473, 487 (1904);

see In re Conte, 33 F.3d 303, 306 (3d Cir. 1994) (discussing pre-1978 case law).  Courts

have concluded, however, relying in part upon the legislative history accompanying the

1978 legislation, that Congress intended that section 523(a)(6) have a higher standard

than just recklessness.  In re Conte, 33 at 306; H.R. Rep. No. 595, 95th Cong., 2d Sess.

365 (1978) ("'[W]illful' means deliberate or intentional.  To the extent that Tinker v.

43

Colwell . . . held that a looser standard is intended, and to the extent that other cases have

relied on Tinker to apply a 'reckless disregard' standard, they are overruled.").

Thus, the United States Supreme Court, in Kawaauhau v. Geiger, 523 U.S.

57 (1998), narrowly defined the phrase "willful and malicious" used in section 523(a)(6).

The Court construed section 523(a)(6) as limited in scope to intentional torts:

> The word "willful" in (a)(6) modifies the word "injury,"
> indicating that nondischargeability takes a deliberate or
> intentional injury, not merely a deliberate or intentional act
> that leads to injury.  Had Congress meant to exempt debts
> resulting from unintentionally inflicted injuries, it might have
> described instead "willful acts that cause injury."  Or,
> Congress might have selected an additional word or words,
> i.e., "reckless" or "negligent," to modify "injury."  Moreover,
> as the Eighth Circuit observed, the (a)(6) formulation triggers
> in the lawyer's mind the category "intentional torts," as
> distinguished from negligent or reckless torts.  Intentional
> torts generally require that the actor intend "the consequences
> of an act," not simply "the act itself."  Restatement (Second)
> of Torts § 8A, comment a, p. 15 (1964).

Id. at 61-62 (emphasis in original); see also In re Markowitz, 190 F.3d 455, 464 (6th Cir.

1999).

Similarly, the Third Circuit Court of Appeals has observed:

> [W]hen Congress required more than recklessness for
> nondischargeability, it required that the debtor have engaged
> in conduct more culpable than taking a deliberate action that
> had a high probability of producing harm. . . .  Rather, for the
> injury to have been "willed" by the debtor, it must at least
> have been substantially certain to result from the debtor's act.

In re Conte, 33 F.3d at 307; see In re Su, 290 F.3d 1140, 1144 (9th Cir. 2002) ("§

523(a)(6) renders debt nondischargeable when there is either a subjective intent to harm,

or a subjective belief that harm was substantially certain.").

44

Accordingly, "[a]n injury is willful and malicious under the Code only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result." In re Conte, 33 F.3d at 305. "We hold that actions are willful and malicious within the meaning of § 523(a)(6) if they either have a purpose of producing injury or have a substantial certainty of producing injury." Id. at 307; see, e.g., In re Jacobs, 381 B.R. 128, 144-45 (Bankr. E.D. Pa. 2008).

Here, Adamar contends that section 523(a)(6) is applicable because Ms. August willfully borrowed money from it and other casinos without any intention of repayment and with a design to discharge her obligations under the Bankruptcy Code. Plaintiff's Posttrial Memorandum, at 16. For the reasons stated above, this contention was unproven. The evidence presented does not support a finding that the debtor acted upon such a scheme. That is, Adamar failed to prove that in February 2009, Ms. August, who had borrowed from and repaid loans to Adamar for almost 30 years, suddenly decided that she would borrow and intentionally not repay, knowing the consequential effect it would have upon her gambling habit. Thus, section 523(a)(6) does not preclude the discharge of Adamar's claim. See In re Miller, 310 B.R. at 202; In re Poskanzer, 143 B.R. at 1000.

VII.

Last for determination is Ms. August's request that she is entitled to an award of costs and attorney's fees against Adamar pursuant to 11 U.S.C. § 523(d). That provision states:

45

> If a creditor requests a determination of dischargeability of a
> consumer debt under subsection (a)(2) of this section, and
> such debt is discharged, the court shall grant judgment in
> favor of the debtor for the costs of, and a reasonable
> attorney's fee for, the proceeding if the court finds that the
> position of the creditor was not substantially justified, except
> that the court shall not award such costs and fees if special
> circumstances would make the award unjust.

Thus, to qualify for this statutory fee-shifting provision, five criteria must

be met: the creditor must bring a nondischargeability complaint under section 523(a)(2);

the creditor's complaint under section 523(a)(2) must involve a "consumer debt"; the

consumer debt must be found to be dischargeable; the court must find that the creditor's

nondischargeability complaint was not "substantially justified"; and there must be no

special circumstances which would make the award of attorney's fees unjust.  See, e.g.,

In re Ritter, 404 B.R. 811, 831 (Bankr. E.D. Pa. 2009).

There is no dispute that Adamar sought nondischargeability of its claim

under section 523(a)(2), and that, for reasons stated above, it did not prevail.  The parties

have stipulated that Adamar's claim against Ms. August is classified under 11 U.S.C. §

101(8) as a consumer debt.  Joint Pretrial Statement, Uncontested Fact #24.

Congress borrowed the phrase "substantially justified" from the Equal

Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A).  See, e.g., In re Hunt, 238 F.3d 1098,

1103 (9th Cir. 2001) (citing S. Rep. No. 98-65, at 9 (1983)).  The Third Circuit has

defined this phrase when applying EAJA as follows:

> The Supreme Court has held that, as used in the EAJA,
> "substantially justified" does not mean "justified to a high
> degree" but instead means "justified in substance or in the
> main—that is, justified to a degree that could satisfy a
> reasonable person."  Pierce v. Underwood, 487 U.S. 552, 565
> . . . (1988).  Put another way, substantially justified means
> having a "reasonable basis in both law and fact."  Id.

46

<u>Johnson v. Gonzales</u>, 416 F.3d 205, 210 (3d Cir. 2005) (citations omitted).  To establish a reasonable basis in both law and fact under EAJA requires: (1) a reasonable basis in truth for the facts alleged, (2) a reasonable basis in law for the theory propounded, and (3) reasonable support in the facts alleged for the legal theory advanced."  <u>Brinker v. Guiffrida</u>, 798 F.2d 661, 664 (3d Cir. 1986).

In the bankruptcy context under section 523(d), one commentator has concluded that those same elements apply:

> The "substantially justified" standard is derived from the Equal Access to Justice Act, under which a losing party must make a strong showing of justification for its claims.  The party attempting to prove substantial justification for its action must show that there was a reasonable basis for the facts asserted, a reasonable basis in the law for the legal theory proposed and support for the legal theory by the facts alleged. Section 523(d) also provides, however, "that the court shall not award such costs and fees if special circumstances would make the award unjust."  If the creditor has a sound case, acts in good faith, and has not been guilty of abusive practices in obtaining a false statement, the court is permitted to deny judgment for costs and attorney's fees even though the debtor may ultimately prevail after trial.

4 <u>Collier on Bankruptcy</u>, ¶ 523.08[8] (16th ed. 2010) (footnotes omitted).

In this proceeding, Adamar contended that Ms. August decided in February 2009 to obtain loans from it and other casinos without intending to use those funds to gamble, and to "walk" away with those funds without repaying them.  If proven, such a contention could support relief under section 523(a)(2).  It also maintained that the debtor made a false representation when signing her markers.  In support thereof Adamar relied heavily upon tracking records it kept and those kept by other casinos, and upon <u>In re Poskanzer</u>.

47

Upon careful review of all of the evidence, I concluded that Adamar did not prove its contention: because the tracking records were incomplete; because those records were in conflict with other evidence presented, including evidence from the credit file of another casino; and based upon the credibility of the testimony introduced at trial. Furthermore, the facts in <u>Poskanzer</u> were distinguishable from those ultimately proven at trial.

Nevertheless, I also conclude that Adamar's section 523(a)(2) claims were substantially justified within the meaning of section 523(d) when made within the deadline imposed by Fed. R. Bankr. P. 4007. Thus, the debtor's request for an award of counsel fees under section 523(d) shall be denied. <u>See generally</u> <u>In re Baumblit</u>, 15 Fed. Appx. 30 (2d Cir. 2001); <u>In re Stearns</u>, 241 B.R. 611 (Bankr. D. Minn. 1999).

An appropriate order will be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: March 3, 2011

48